UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ x
                                     :

SONY MUSIC ENTERTAINMENT,       :    Case No.: 16 Civ. _____
                                       :

                Plaintiff,     :    **COMPLAINT**
                                       :

                     v.       :    **ECF CASE**
                                       :

ANTHONY BAY, ELLIOTT PETERS, and JIM  :    **<u>JURY TRIAL DEMANDED</u>**
RONDINELLI,                         :
                                       :

                Defendants.   :
------------------------------------------------------------x

        Plaintiff Sony Music Entertainment ("SME" or "Plaintiff"), by its undersigned attorneys, brings this lawsuit against Defendants Anthony Bay, Elliott Peters, and Jim Rondinelli (collectively, "Defendants," and each a "Defendant"), and alleges as follows:

<u>**NATURE OF THE ACTION**</u>

        1.      This action concerns a fraud planned and perpetuated by Defendants against Sony Music Entertainment over an approximately yearlong period in 2014 and 2015.

        2.      SME's business is focused on producing, manufacturing, distributing, selling, licensing, and otherwise exploiting audio and audiovisual recordings throughout the world.  Its well-known and respected music labels—which include Columbia, RCA, Epic, Sony Nashville, Legacy, and Sony Masterworks, among others—are home to some of the most popular and successful recording artists of all-time, including Michael Jackson, Bob Dylan, Bruce Springsteen, Beyoncé, Pharrell Williams, Adele, and Miles Davis, to name just a few.  SME is the second-largest recorded music company in the world.

        3.      Defendants are former directors, officers, and/or employees of Rdio, Inc. ("Rdio"), a defunct online music streaming service.

4.      Rdio's music streaming business operated from 2010 until December 22, 2015, when the United States Bankruptcy Court for the Northern District of California approved the sale of Rdio assets to Pandora Internet Radio ("Pandora"), pursuant to an agreement that had been executed the previous month.  Rdio and Pandora had been working together towards this bankruptcy sale since June 2015 or earlier.

5.      Prior to December 22, 2015, defendant Bay was Rdio's CEO, defendant Peters was Rdio's Vice President and General Counsel, and defendant Rondinelli was Rdio's Senior Vice President.  Upon information and belief, Peters remains Rdio's General Counsel, and Bay and Rondinelli are no longer employed by Rdio.

6.      Defendant Bay was—and upon information and belief still is—also an owner, executive officer, and director of Pulser Media, Inc., which owned 79% of Rdio and held 98% of the secured debt issued by Rdio.  Thus, in the event of an Rdio bankruptcy, Pulser and Bay expected to be first in line to recover whatever value remained in Rdio.

7.      Until it ceased operations, Rdio offered its consumers the ability to stream more than 20 million songs on their computers and mobile devices.  Many of these recordings were owned or controlled by SME, which in 2010 entered into an agreement with Rdio that permitted Rdio to distribute SME's content (the "Content Agreement").

8.      Between October 2014 and September 2015, SME and Rdio negotiated the terms of an amendment to the Content Agreement.  Rdio was represented by Defendants in these negotiations, typically by Peters and Rondinelli, but also at times by Bay.

9.      While those negotiations were ongoing, SME entered into a series of interim extensions of the Content Agreement.  These extensions provided Rdio continued access

to SME's sound recordings, and also allowed Rdio to avoid paying $5.5 million that originally was due to SME by December 31, 2014.  Rdio's service was not sustainable without access to SME's large and valuable catalog of popular recordings; indeed, Rdio acknowledged in the bankruptcy that its content licensing agreements with SME and other owners of sound recordings were among its "primary assets."  A loss of access to SME's content would have been devastating to Rdio's business, and would have led many of its key employees—including Rdio's team of skilled, mobile software engineers—to leave the company for other opportunities. That would have diminished the value of Rdio's business to Pandora, which was interested largely in acquiring these employees' contracts, and would have put at risk Defendants' jobs and the ability of Pulser and Bay to recover their investments.

10.     Unbeknownst to SME, however, at the same time that Rdio was negotiating the amendment to its Content Agreement with SME, it was simultaneously negotiating its deal with Pandora—under which Rdio would file for bankruptcy; Pandora would buy Rdio's assets out of bankruptcy; defendant Bay (as part-owner, executive officer, and director of Rdio's secured creditor) would expect to be first in line to receive proceeds of the Pandora deal; and SME (as an unsecured creditor) would receive pennies on the dollar for the amounts owed to it under the amended Content Agreement.

11.     Defendants knew that, had SME learned about Rdio's negotiations with Pandora at any time during the negotiations to amend the Content Agreement, SME would have demanded immediate payment of the $5.5 million that Rdio owed to SME, and would have refused to grant Rdio further access to the recordings owned by SME.  That in turn would have substantially diminished Rdio's business and jeopardized the secret proposed sale to Pandora.

3

12.     In order to induce SME to continue to provide Rdio with the rights to

SME's catalog, Defendants continued to negotiate the terms of an amendment to the Content

Agreement—exchanging term sheets that contemplated payments by Rdio over a period of

years—while concealing from SME the fact that Rdio was negotiating an agreement with

Pandora that Defendants knew would render Rdio unable to meet these obligations to SME.

13.     Bay ultimately signed the amendment to the Content Agreement on Rdio's

behalf on September 30, 2015 (the "Renewal Amendment").  Under the Renewal Amendment,

SME agreed to license to Rdio the use of the sound recordings owned or controlled by SME, in

exchange for which Rdio agreed to pay SME millions of dollars through March 31, 2017.

14.     Unbeknownst to SME at the time, Rdio had *one day earlier* signed a

Letter of Intent with Pandora concerning the intended bankruptcy filing, which would prevent

Rdio's performance of its obligations to SME under the Renewal Amendment.  Rdio never

intended to fulfill the commitments it made in the Renewal Amendment.

15.     A material provision of the Renewal Amendment was Rdio's obligation to

pay SME $2 million on October 1, 2015—the day after the Renewal Amendment was executed.

This presented a dilemma for Rdio:  the Pandora deal would be jeopardized *either* upon Rdio's

taking $2 million in cash out of its business, *or* upon Rdio failing to make the payment to SME

and putting its ongoing access to SME's content at risk.  To escape this bind, Defendants made

false statements designed to induce SME to extend the due date for the payment rather than

terminate the Renewal Amendment.  Defendants Bay and Rondinelli fraudulently misrepresented

to SME that Rdio was raising capital that would enable it to make this payment, when in fact

Rdio was finalizing its deal with Pandora, under which Rdio would pay SME neither the $2

4

million, nor the monthly fees it owed for the rights to SME's content that Rdio continued to exploit, nor the millions of dollars in other payments required under the Renewal Amendment.

16.    As detailed below, Rdio ultimately succeeded in hiding the Pandora deal from SME until November 16, 2015, the date on which Rdio and Pandora signed an Asset Purchase Agreement and Rdio filed for Chapter 11 relief.  As a result of this fraud, SME lost millions of dollars owed to it by Rdio.

17.    Each of the Defendants was an officer or director of Rdio, and each of them knew of and participated in the fraud on SME.  Defendants Bay and Peters were both personally involved in Rdio's simultaneous negotiations with Pandora and SME, and knew that Rdio's representations to SME were false.  In addition, Defendants Bay and Rondinelli personally made fraudulent misrepresentations to SME in furtherance of the fraudulent scheme. Defendants' fraudulent actions substantially harmed SME, and enriched the individual Defendants by making the Pandora deal possible.

## JURISDICTION AND VENUE

18.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a), the citizenship of the parties being diverse and the matters in controversy exceeding the amount of $75,000, exclusive of interest and costs.

19.    A substantial part of the events giving rise to this lawsuit occurred in New York.  Accordingly, venue is proper in New York pursuant to 28 U.S.C. § 1391(b).

20.    Defendants are subject to personal jurisdiction in this Court pursuant to CPLR § 302(a)(1), because they initiated and pursued substantial, purposeful business in New York giving rise to this case.  Rdio could not operate a competitive streaming service without

access to SME's valuable library of sound recordings.  On Rdio's behalf, Defendants therefore

sought out an ongoing business relationship with SME—a New York-based entity—and came to

SME's New York headquarters to negotiate the terms of Rdio's contract with SME (including

the Renewal Amendment) in person.  The terms of that contract, which remained unchanged in

the Renewal Amendment (which Defendant Bay personally signed), provided that it was

"entered into in the State of New York"; that its interpretation would "be governed by the law of

the State of New York applicable to contracts entered into and performed entirely within New

York"; and that "[t]he New York courts (state and federal, located in New York County), will

have sole jurisdiction of any controversies regarding this Agreement."  In addition, as more fully

detailed below, Defendants further projected themselves into New York by phone and email by

directing their fraudulent misrepresentations and omissions to SME in New York for purposes of

inducing SME to extend payment terms under the Renewal Amendment.  Upon information and

belief, Rdio also maintained an office in New York City for the purpose of carrying out its

ongoing relationship with New York-based music and entertainment companies, including SME.

## PARTIES

21.     Plaintiff SME is a Delaware general partnership, the partners of which are

citizens of New York and Delaware.  SME's headquarters and principal place of business are at

25 Madison Avenue, New York, New York 10010.  SME markets, sells, distributes, and

otherwise exploits audio and audiovisual recordings embodying musical and/or vocal

performances by recording artists.

22.     Anthony Bay is the former Chief Executive Officer of Rdio, Inc.  Upon

information and belief, Mr. Bay is a resident of California.

23.     Elliott Peters is the General Counsel of Rdio, Inc. and also holds or held the title of Senior Vice President.  Upon information and belief, Mr. Peters is a resident of California.

24.     Jim Rondinelli is the former Senior Vice President of Rdio, Inc.  Upon information and belief, Mr. Rondinelli is a resident of California.

## FACTS ENTITLING PLAINTIFF TO RELIEF

### A.     Rdio and its Relationship with SME

25.     Rdio was founded in 2008, and its online music streaming service launched in 2010.  Rdio's streaming service was available on its website and through apps for Android, iPhone, iPad, and other devices.  At the time it ceased operations on December 22, 2015, Rdio was available in 86 countries.  For $9.99 a month, it offered consumers unlimited, on-demand, ad-free access to a library of more than 20 million songs.  It also offered consumers other service options, including a $3.99 per month subscription, and free, advertising-based streaming services.

26.     The market for online streaming services is highly competitive. Throughout its existence, Rdio competed for subscribers and listeners with other established streaming services such as Spotify, Rhapsody, and others.  Rdio sought to compete by offering what it touted as superior technology developed by a team of high caliber software engineers. Regardless of its technology, however, Rdio could not effectively compete without offering consumers a large library of streamable music, including recordings owned or controlled by SME (including recordings by the likes of Bruce Springsteen, Michael Jackson, Beyoncé, and Adele, to name just a few) and other major record companies.

27.     Pulser Media, Inc. owned 79% of Rdio's equity and thus controlled Rdio. Bay, in addition to serving as Rdio's CEO, was also an equity owner, executive officer, and director of Pulser Media.  Upon information and belief, Pulser Media was an entity organized solely to be the parent of Rdio.

28.     In May 2010, Rdio and SME entered into the Content Agreement, which governed the distribution and exploitation of content owned or controlled by SME through Rdio's online and mobile music subscription service.  Although the Content Agreement was modified from time to time between 2010 and 2014, the core bargain remained the same:  SME permitted Rdio to stream recordings owned or controlled by SME, and Rdio agreed to pay SME a portion of Rdio's revenue, subject to an annual "Minimum Revenue Guarantee."  The Content Agreement was signed on SME's behalf by New York-based Executive Vice President, Head of Business and Legal Affairs, Global Digital Business Group L. Jeff Walker.

29.     Under the Content Agreement, Rdio was required to pay SME a Minimum Revenue Guarantee of approximately $5.5 million by December 31, 2014.  In or around October 2014, Rdio, through Peters and Rondinelli, approached SME's New York-based employees to renegotiate its Content Agreement with SME and defer the due date for this payment.  On December 3, 2014, each of the Defendants participated in an in-person meeting at SME's headquarters in New York to discuss this proposal.

30.     After this meeting in New York, SME initially agreed to an extension of the term of the Content Agreement to March 31, 2015, and then agreed to a series of short interim extensions while a more permanent renewal amendment was negotiated.  These extensions allowed Rdio uninterrupted access to SME's library of digital content and enabled Rdio to deliver millions of additional streams to its customers, even though Rdio had not paid the

Minimum Revenue Guarantee that it owed SME.  Defendants Peters and Rondinelli were Rdio's

principal negotiators during this time, although Defendant Bay and others were involved at

times.  SME was represented in negotiations by New York-based employees including Andre

Stapleton, Senior Vice President, Global Business Development and Strategy, Global Digital

Business Group, and Alison Dow, Senior Director, Business and Legal Affairs, Global Digital

Business Group.  As part of these negotiations, Defendants Bay and Rondinelli participated in in-

person meetings at SME's New York headquarters on April 15, 2015, with defendant Peters

participating by phone.  The remaining negotiations took place via phone or email; the parties

never met anywhere other than in New York.

   31.  On September 30, 2015, Bay executed the Renewal Amendment on Rdio's

behalf.  A material provision of the Renewal Amendment was Rdio's obligation to pay SME $2

million on October 1, 2015, the day after Bay signed the deal.  The Renewal Amendment was

executed by New York-based SME Executive Vice President L. Jeff Walker.

  **B.**  **Rdio's Deal with Pandora**

   32.  Unbeknownst to SME, at the same time that Rdio was negotiating the

Renewal Amendment with SME, Rdio was also negotiating with Pandora, which expressed an

interest in June 2015 or earlier in purchasing Rdio's assets through a bankruptcy sale.  Upon

information and belief, the key assets that Pandora was interested in acquiring from Rdio were

the employment contracts with Rdio's top software engineers.  Pandora was also interested in

technology and intellectual property.  Pandora would not, however, assume Rdio's Content

Agreement with SME.

   33.  Discussions between Pandora and Rdio concerning the bankruptcy sale

lasted many months.  A declaration submitted by Peters in the Rdio bankruptcy case states that

Rdio began looking for a buyer or merger partner sometime around the fall of 2014, and Pandora emerged as the leading candidate by June 2015.  Peters's declaration also admits that Pandora was interested in acquiring Rdio's assets only if it could do so through a bankruptcy.

34.     As revealed in bankruptcy filings, the vast majority of Rdio's secured debt—approximately $186 million out of $190 million, or 98%—is owned by Pulser Media.  As noted above, Defendant Bay is an executive officer, director, and owner of Pulser Media.  Bay thus stood to gain personally from the bankruptcy sale, as he expected to be first in line to recover the proceeds of the sale.

35.     In addition to being the predominant holder of Rdio's secured debt, Pulser Media also owns and controls almost 80% of Rdio's equity shares, and thus had control over Rdio's decision to reach a deal with Pandora and to enter bankruptcy.

36.     On July 8, 2015, Pandora presented Rdio with a preliminary Letter of Intent to proceed with a sale of Rdio's assets in bankruptcy.  This was followed by further negotiations that culminated in a signed Letter of Intent between Rdio and Pandora on September 29, 2015, one day prior to Anthony Bay's signing of the Renewal Amendment with SME.  In other words, Rdio and Pandora had agreed in writing to proceed with a bankruptcy sale *before* Bay executed the Renewal Amendment.  Under the contemplated transaction, Pandora would not assume Rdio's Content Agreement with SME.

37.     Pandora and Rdio executed a final Asset Purchase Agreement on November 16, 2015.  The Asset Purchase Agreement was signed on Rdio's behalf by Peters.  Pursuant to the Agreement, Pandora agreed to purchase Rdio assets for approximately $75 million, but Pandora did not assume the SME-Rdio Content Agreement.  Upon information and

belief, Pandora and Rdio negotiated the terms of the final Asset Purchase Agreement between September 29, 2015 and November 16, 2015.

38.     On November 16, 2015, Rdio filed for Chapter 11 relief in the United States Bankruptcy Court for the Northern District of California.  Only then did SME learn for the first time that Rdio had been planning for months to file for bankruptcy, and had been negotiating the terms of the filing with Pandora at the same time that Rdio was negotiating the Renewal Amendment with SME.

39.     The Bankruptcy Court approved the sale of Rdio assets to Pandora on December 22, 2015.  Rdio shut down its music streaming services that same day.  On December 23, 2015, Pandora issued a press release stating that it had completed its acquisition of Rdio's assets.  Pandora, according to the press release, added "nearly 100 former Rdio employees to its product, engineering and content licensing teams."  As Pandora stated in its press release, "[t]his move will accelerate Pandora's plan to substantially broaden its subscription business and roll out a multi-tier product offering by late 2016."

**C.     The Fraud**

40.     To enable its deal with Pandora, Rdio concealed the materials facts of that deal from SME, and fraudulently induced SME to extend the Content Agreement and enter into the Renewal Amendment, and to then extend the October 1, 2015 deadline by which Rdio was obligated to pay SME $2 million thereunder.  Each of Bay, Peters, and Rondinelli knew of and participated in this fraud.

41.     Defendants' course of fraudulent conduct was designed to conceal Rdio's planned bankruptcy sale to Pandora, avoid payment of revenue guarantees owed by Rdio to SME, and preserve Rdio's ability to stream SME-owned recordings until the Pandora deal was

finalized.  Defendants knew that Rdio's planned bankruptcy would have been a material consideration for SME in deciding whether to enter into the Renewal Amendment and then extend its payment terms, or to withdraw its content from Rdio and insist upon payment of the millions of dollars Rdio already owed.  But preserving Rdio's access to SME's content was critical to the continued viability of Rdio's business and, by extension, to the completion of the Pandora deal.

        42.     Rdio's loss of its right to stream SME-owned content would have been devastating for its business because SME is the second-largest recording label in the world. According to filings in the bankruptcy case, Rdio was already suffering up to $2.4 million in losses per month as of the fall of 2014.  Losing SME's content meant that Rdio was extremely unlikely to survive; its key employees would have left for competitors or other new technology companies, and the investments of Rdio's investors, including Bay, would have been lost.  This, in turn, would have jeopardized the Pandora deal, which Pandora was pursuing in large part to acquire the employment contracts for Rdio's talented team of software engineers.  Peters, in a declaration to the Bankruptcy Court, noted Rdio's team of "high caliber Silicon Valley engineering talent," and Pandora touted its acquisition of this team in its December 23, 2015 press release.  A downturn in Rdio's business would have caused these skilled, highly mobile employees to leave the company.  This, in turn, would have put Defendants' jobs at risk and ruined Defendant Bay's ability to recover his personal investment in Rdio through a sale in bankruptcy.  Upon information and belief, this also would have jeopardized substantial bonus payments to Defendants, including a payment of $213,000 to Peters in approximately December of 2015, which was revealed in Rdio bankruptcy filings.

43.    By fraudulently inducing SME to enter into the interim extensions of the Content Agreement and the Renewal Amendment, Defendants ensured that Rdio had uninterrupted access to SME's catalog of recordings and thus that Rdio's business was not disrupted before the deal was finalized.

44.    On September 29, 2015, Rdio and Pandora signed a letter of intent to proceed with a sale of Rdio's assets in bankruptcy.  One day later, on September 30, 2015, Bay executed the Renewal Amendment, which provided that Rdio was obligated to remit to SME a $2 million prepayment to SME *the very next day*, October 1, 2015.  This prepayment obligation was a key term of the Amendment and had been the subject of intense negotiations between SME and Rdio, which was principally represented in such negotiations by Peters and Rondinelli.

45.    Until SME learned of Rdio's bankruptcy filing on November 16, 2015, no one—not Bay, not Peters, not Rondinelli—disclosed the preexisting Pandora Letter of Intent to SME, even though the letter made Rdio's performance of its obligation to pay $2 million under the Renewal Amendment impossible.  Bay was personally involved in and knew about both the Rdio-Pandora negotiations (which concerned the sale of a company of which he was CEO and that was owned by another company of which he was an executive officer, director, and owner) and Rdio's negotiations with SME (which he traveled to New York to participate in personally). Peters, Rdio's General Counsel, was also directly involved in and knew about the Pandora negotiations—indeed, Peters signed the Rdio-Pandora Asset Purchase Agreement—at the same time he was negotiating the Renewal Amendment with SME.  On information and belief, Rondinelli, as a Senior Vice President of the company, also knew about the Pandora negotiations.  Yet all of them knowingly or recklessly omitted to disclose the fact of the Letter of Intent to SME, which omission rendered Rdio's agreement to pay materially misleading.

46.     On September 30, 2015, immediately after Bay's execution of the

Renewal Amendment, Rondinelli contacted SME's Senior Vice President Andre Stapleton in

New York.  In that conversation, Rondinelli requested a one-month extension of the $2 million

prepayment deadline from October 1, 2015 to November 1, 2015.  To induce Stapleton to agree

to the extension, Rondinelli represented that Rdio was on the verge of signing new agreements to

raise capital out of which the $2 million would be paid.  Rondinelli represented to Stapleton that

Rdio would be able to pay the $2 million prepayment by October 28, 2015, but in any event

would do so no later than November 1, 2015.

47.     SME granted Rdio the extension only after Rondinelli specifically assured

Stapleton that Rdio would pay the $2 million by November 1, 2015.  Stapleton informed

Rondinelli that he was receiving pressure from SME's finance department, and that SME would

only agree to the extension if Rdio could guarantee that the payment would be made by

November 1, 2015.  Rondinelli assured Stapleton that the funding was forthcoming, confirmed

that the money would be paid by November 1, 2015, and promised that the two men would not

be repeating the conversation a month later.  In reasonable reliance on Rondinelli's

representations, SME granted the extension to November 1, 2015, and thus ensured Rdio

continued, uninterrupted access to SME's digital content.

48.     These representations by Rondinelli were fraudulent.  Rdio was not raising

capital, as Rondinelli falsely represented, nor did Rdio plan to pay the $2 million to SME by

November 1, 2015.  Rdio was instead finalizing the agreement with Pandora to sell off its assets

in a bankruptcy proceeding, but needed continued access to SME's content to prevent the deal

from falling apart.  Upon information and belief, Rondinelli, as Senior Vice President, knew or

was reckless in not knowing that his statements on September 30, 2015 were false.  Bay and

14

Peters, both of whom knew of the pending transaction with Pandora, also knew that Rondinelli's representations to SME on behalf of Rdio were false.

49.     On or about November 1, 2015, Rondinelli contacted Stapleton in New York and stated that Rdio would not be able to make good on its promise to pay the $2 million by that date.

50.     On November 2, 2015, Bay sent an email to Dennis Kooker, SME's New York-based President, Global Digital Business & U.S. Sales.  Bay cc'd Stapleton and Rondinelli on the email.  Bay wrote to Kooker what Rondinelli had previously told Stapleton—that Rdio could not meet the November 1, 2015 deadline for the $2 million prepayment.  Bay again failed to inform Kooker that Rdio and Pandora were working towards a bankruptcy sale, even though Rdio was by then only two weeks away from its Chapter 11 filing, and Bay, as the CEO, knew this.  Instead, Bay told Kooker that Rdio simply needed more time to make the payment.  As Bay wrote, Rdio was attempting "to secure new financing," implying that the $2 million would be paid out of such financing.  Bay also reported that "the results appear promising," asking Kooker for his "continued patience as we work to resolve this situation ASAP."

51.     Again, this was fraud.  Bay, as the CEO of Rdio, knew that these statements were false; that Rdio was not securing new financing that would enable it to pay the $2 million to SME; and that Rdio was going into bankruptcy and was pursuing a sale of its assets pursuant to which SME's contract would not be assumed.  In reliance on this misrepresentation, SME agreed again to extend the payment date and to allow Rdio continued, uninterrupted access to SME's digital content, which enabled Rdio to finalize its deal with Pandora.  Had SME known the truth, it would have immediately given Rdio notice of default under the Renewal Amendment.

52.     Defendant Peters likewise knew of and participated in the fraud.  He was directly involved in the negotiations of both Rdio's deal with Pandora and Rdio's negotiations of the Renewal Amendment with SME.  Peters thus knew that Rdio's representations to SME that it was in the process of obtaining financing that would enable it to pay SME were false; Rdio instead was negotiating the Asset Purchase Agreement with Pandora, which he personally signed on Rdio's behalf.

53.     SME would not have continued to extend the Content Agreement on an interim basis, signed the Renewal Amendment, or agreed to extend Rdio's October 1, 2015 deadline to pay SME $2 million under the Renewal Amendment had it known that Rdio was negotiating its transaction with Pandora.  It did so only in reliance on Defendants' fraudulent misrepresentations and omissions detailed above.

54.     SME was damaged as the result of its reasonable reliance on Rdio's knowing and material misrepresentations and omissions.  Rdio never paid SME the $5.5 million Minimum Revenue Guarantee, nor did it pay the $2 million prepayment under the Renewal Amendment, nor did it pay SME the amounts it owed for use of SME's content in August, September, and October of 2015, even though Rdio's users continued to stream recordings owned by SME.  According to an Rdio bankruptcy filing, Bay personally was paid more than $135,000 between August 2015 and Rdio's filing for bankruptcy on November 16, 2015.  Bay was also paid $200,000 on May 29, 2015, and more than $66,000 in June and July of 2015.  Upon information and belief, Rdio also paid Defendants substantial cash bonuses in approximately December of 2015, including a bonus to Peters of $213,000.  Had Defendants revealed the truth to SME, SME would have acted to enforce its contractual rights to the Minimum Revenue Guarantee owed under the Content Agreement, and would not have licensed

its content to Rdio for August or any other subsequent month—valuable rights for which SME

was never paid.

## COUNT ONE

### Fraudulent Inducement

55.     SME incorporates by reference the allegations set forth in all prior

paragraphs of this Complaint as if set forth fully herein.

56.     As described above, each of the Defendants participated in or had

knowledge of Rdio's fraud.  Defendants Bay and Rondinelli knowingly or recklessly made false,

material misrepresentations and omissions to SME regarding Rdio's purported intention to pay

SME $2 million.  Each of the Defendants had actual knowledge of these fraudulent

misrepresentations.  In addition, each of the Defendants, in furtherance of the fraudulent scheme,

knowingly concealed Rdio's planned bankruptcy from SME from at least June 2015 until the

bankruptcy filing on November 16, 2015.  All of these actions were undertaken to induce SME

to extend rights and restructure Rdio's payment obligations to preserve the Pandora deal.

57.     SME entered into the Renewal Amendment and the earlier interim

extensions of the Content Agreement, and agreed to further extend Rdio's payment obligations

under the Renewal Amendment, in justifiable reliance on Rdio's material misrepresentations and

omissions.

58.     Through their fraudulent misrepresentations and omissions and SME's

reliance thereupon, Defendants ensured Rdio's uninterrupted access to SME's catalog of digital

content.  This, in turn, allowed Rdio to pursue and successfully complete its deal with Pandora,

without fulfilling Rdio's payment obligations to SME.

17

59.    By relying on Defendants' fraudulent misrepresentations and omissions, SME suffered damages to be proven at trial.

## COUNT TWO

### Unjust enrichment

60.    SME incorporates by reference the allegations set forth in all prior paragraphs of this Complaint as if set forth fully herein.

61.    SME provided Rdio with valuable access to SME-owned recordings as a direct result of Defendants' fraud.  This enabled Rdio to continue to run its business until December 22, 2015 and finalize its sale to Pandora.

62.    Each of the Defendants was enriched by the fraud at SME's expense. Rdio never paid SME the $5.5 million Minimum Revenue Guarantee due December 31, 2014, nor did it pay the $2 million prepayment under the Renewal Amendment.  Nor did Rdio pay anything at all to SME for the use of SME's content in August, September, and October of 2015, even though Rdio's users continued to stream recordings owned by SME.  Bay, Peters, and Rondinelli were able to maintain their jobs and the concomitant salary by virtue of SME's continued provision of rights to its catalog, for which SME was never paid.  In fact, Rdio paid Bay more than $135,000 between August 1, 2015 and Rdio's filing for bankruptcy on November 16, 2015, and paid Peters a bonus of $213,000 in December 2015—money that should have been paid to SME for the rights it licensed to Rdio.  In addition, as an owner of Pulser Media, which owned 98% of Rdio's secured debt, Defendant Bay was personally enriched by the sale to Pandora.

63.    It would be against equity and good conscience to permit Defendants to retain any benefits that they obtained as a result of their fraudulent conduct.

18

## DEMAND FOR JURY TRIAL

SME demands a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, SME respectfully requests that this Court enter judgment:

      a.      Finding Defendants liable for fraud.

      b.      Finding Defendants liable for unjustly enriching themselves at SME's expense such that it would be against equity and good conscience to permit them to retain the benefits described herein.

      c.      Awarding SME compensatory, punitive, and all other damages to which it is entitled as the result of Defendants' knowing and willfully fraudulent misrepresentations and omissions.

      d.      Awarding SME prejudgment and post judgment interest.

      e.      Awarding SME the fees, costs and expenses incurred in this action, an award of attorneys' and/or experts' fees and costs; and

      f.      Granting SME such other relief as the Court deems just and proper.

New York, New York                    COVINGTON & BURLING LLP
April 4, 2016


                                      By      s/ Jonathan M. Sperling
                                              Jonathan M. Sperling
                                              Dianne F. Coffino
                                              Jonathan D. Cohen

                                      The New York Times Building
                                      620 Eighth Avenue
                                      New York, New York 10018-1405
                                      (212) 841-1000
                                      jsperling@cov.com
                                      dcoffino@cov.com
                                      jcohen@cov.com

                                      *Counsel for Plaintiff Sony Music Entertainment*